IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRIS WASHINGTON-EL,                :
                                    :    Civil No. 3:12-CV-1979
        Plaintiff                   :
                                    :    (Judge Nealon)
        v.                          :
                                    :    (Magistrate Judge Carlson)
ROBERT COLLINS, et al.,             :
                                    :
        Defendants                  :

## REPORT AND RECOMMENDATION

## I.    Statement of Facts and of the Case

This is a *pro se* civil rights action brought by a state prisoner, Chris Washington-El, through the filing of a complaint on October 3, 2012, (Doc. 1.), which Washington-El subsequently amended on October 17, 2012. (Doc. 7.) This amended complaint is a carefully-detailed 24 page document, which sets forth factual averments and legal claims in 204 separately numbered paragraphs. (Id.)

In this comprehensive complaint, Washington-El protests the conditions of his disciplinary housing over approximately two years at the State Correctional institution (SCI) Frackville, while he was in administrative custody on the Restricted Release List (RRL), before being transferred to SCI-Huntingdon. (Id.) Specifically, Washington-El alleges in some detail that during this two-year span prison officials

retaliated against him because of his advocacy on behalf of himself and others; denied him due process during periodic assessments of his RRL housing status; held him for a prolonged period under conditions that allegedly amounted to cruel and unusual punishment and violated Washington-El's rights under the Eighth Amendment to the United States Constitution; and unlawfully curtailed the exercise of his religious rights for a prolonged period of time.  (Id.)

Despite the detailed nature of Washington-El's allegations, the defendants moved to dismiss the complaint in its entirety, arguing that Washington-El's claims were time-barred and that Washington-El has failed to state a claim upon which relief may be granted. (Doc. 18.)  The district court subsequently denied this motion in its entirety. (Doc. 35.)  Thereafter, the defendants answered the amended complaint and set forth affirmative defenses, including the defense that Washington-El failed to exhaust administrative remedies prior to bringing suit. (Doc. 38.)

Following a period of discovery, the defendants have now filed a motion for summary judgment on all of Washington-El's claims.  In this motion, the defendants focus a substantial majority of their argument on their contention that Washington-El failed to exhaust his claims pursuant to Department of Corrections policies, and that the claims are now barred as a result.  Additionally, the defendants argue that they are entitled to judgment as a matter of law on all of Washington-El's claims on their

merits, either because the claims fail a legal matter or because the facts of record do not offer sufficient support for the claims.  As will be discussed, however, the defendants have in several respects failed to offer sufficient support for their merits arguments, and we find as a result that several of the plaintiff's claims should be permitted to proceed.

As a threshold matter, we find that the defendants have failed to demonstrate that they are entitled to summary judgment based upon Washington-El's alleged failure to exhaust.  Although the defendants have focused the majority of their argument on this issue, and have submitted some evidence in support of this argument, Washington-El has submitted countervailing documentary evidence showing that on at least one occasion in January 2011, he was affirmatively instructed by prison officials to grieve his claims administratively in accordance with DC-ADM 802, a manner that the defendants now contend was not consistent with Department of Corrections policy.  Given the clear dispute in the record on this point, and the fact that Washington-El has submitted documentation that would appear to show that prison officials affirmatively told him to exhaust his claims in a particular way, we recommend that the defendants' motion be denied insofar as it seeks entry of summary judgment on all claims on exhaustion grounds alone.

We also find that the defendants are not entitled to summary judgment on Washington-El's claims that certain of the defendants retaliated against him for engaging in constitutionally protected activity.   The defendants have argued, alternatively:  (1) that these claims were not exhausted; (2) that they lack evidentiary proof; or (3) that they are precluded because Washington-El was adjudicated guilty of one or more of the misconducts that he claims were retaliatory.  However, as noted above, it is not clear from the record that all of these claims are unexhausted, and Washington-El has submitted evidence to show that in at least one instance, a misconduct that was charged against him for refusing an order when he declined a meal was later vacated by the PRC because the refusal to eat a meal did not constitute a sanctionable offense.  On two occasions, it appears that Washington-El used the DC-ADM 802 form to appeal PRC decisions on October 14, 2010, and February 4, 2010, and it appears that on January 26, 2011, prison staff informed Washington-El that he was not only permitted to use DC-ADM 802 for all matters relating to his confinement on administrative custody within the RHU, he was supposed to do so. The record surrounding Washington-El's retaliation claims – which touch upon many aspects of his confinement in administrative custody during his approximately two years at SCI-Frackville – and the defendants' failure to demonstrate that they are entitled to summary judgment on Washington-El's various claims of retaliatory

4

conduct by prison staff makes summary judgment on these claims inappropriate at this time.

Likewise, we find that the defendants have failed to carry their burden at summary judgment with respect to Washington-El's claims that the defendants violated his First Amendment right to the free exercise of his religious beliefs by withholding from him access to religious programming, religious counseling, and religious books.  As discussed below, when an inmate challenges a prison regulation that has the effect of limiting his religious exercise, the defendants bear the burden of coming forward with some evidence to demonstrate a valid, rational connection between a prison regulation and the legitimate, neutral governmental interest put forward to justify it.  This burden is a slight one, but it is one that the defendants have not satisfied on the current record.  To the extent that the defendants can make a showing to justify any restrictions that may have been imposed on Washington-El's access to religious programming and counseling, they should present this evidence in a more narrowly focused and fully documented dispositive motion.  However, the defendants cannot rely upon the Court to make a finding in their favor in the absence of some evidentiary showing to justify particular prison policies.

Washington-El has also brought a claim alleging that the defendants subjected him to cruel and unusual punishment, and that they were deliberately indifferent to

his serious mental health needs, which were exacerbated by his prolonged incarceration in administrative custody. The defendants have not addressed the merits of this claim in this motion in any substantial way, and it is recommended that this claim should survive the pending motion.

In contrast to Washington-El's First Amendment and Eighth Amendment claims, we recommend that the Court grant summary judgment in favor of the defendants on the remainder of the claims in the amended complaint, which either fail as a legal matter or fail because there is insufficient evidence to support them. With respect to the plaintiff's claims for monetary damages or injunctive relief under the Religious Land Use and Institutionalized Persons Act, these claims fail either because the relief that Washington-El seeks is unavailable to him, or because the claims have been rendered moot by Washington-El's transfer from SCI-Frackville.

Likewise, Washington-El's claim that his continued administrative custody and RRL classification violated his rights under the Due Process Clause of the Fourteenth Amendment fail. Even assuming that the circumstances surrounding his custody level trigger due process rights, Washington-El has failed to come forward with sufficient evidence to challenge the defendants' substantial showing that he was provided regular reviews by the Program Review Committee at SCI-Frackville, and that the basis for maintaining Washington-El's status on the RRL was supported and made

after an individualized consideration of the appropriate custodial placement for this inmate.  Washington-El's claim that these reviews were perfunctory or conducted in a manner that Washington-El found lacking is insufficient to create a genuine issue of fact requiring trial.

## II.   Discussion

### A.   Summary Judgment–Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality."  Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  For purposes of Rule 56, a fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408,

412 (3d Cir. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>Id.</u> (quoting <u>Anderson</u>, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof.  <u>See</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  <u>See</u> <u>Martin v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007); <u>see also</u> Fed. R. Civ. P. 56(c).

**B.**     **The Defendants are Not Entitled to Summary Judgment Based Upon the Plaintiff's Alleged Failure to Exhaust Administrative Remedies**

The defendants' leading argument is that Washington-El failed to comply with the requirements prescribed by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA") by filing this lawsuit before he had fully and properly exhausted his claims through the Department of Corrections grievance process set forth in DC-ADM 804. The defendants devote the majority of their argument in their brief to the issue of exhaustion, but factual disputes in the record make summary judgment on this ground improper.

The PLRA requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court. Specifically, the Act provides that:

> No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  "Failure to exhaust is an affirmative defense the defendant must plead and prove; it is not a pleading requirement for the prisoner-plaintiff." Small v. Camden Cnty., 728 F.3d 265, 268-69 (3d Cir. 2013).

9

In accordance with the PLRA, in order to prevail on this affirmative defense a defendant must show that the prisoner failed to comply with exhaustion requirements with respect to any claim that arises in the prison setting, regardless of the type of claim asserted, or the relief sought.  See Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").  As the statute's language makes clear, the exhaustion of available administrative remedies prior to filing suit is mandatory.  See Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.") (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).

Whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts.  See Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013) (judges may resolve factual disputes relevant to the exhaustion issue without the

participation of a jury) see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir.

2010).   Where this process entails fact-finding and resolution of factual disputes,

summary judgment is inappropriate, but the court may resolve the issue of exhaustion

through an evidentiary hearing.   As the court of appeals has observed:

> [J]ust as subject-matter jurisdiction, personal jurisdiction, and venue, exhaustion is a "threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time." Dillon, 596 F.3d at 272 (emphasis added); see Pavey, 544 F.3d at 741 ("Juries decide cases, not issues of judicial traffic control.  Until the issue of exhaustion is resolved, the court cannot know whether it is to decide the case or the prison authorities are to."); cf. McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (likening the doctrine of exhaustion of administrative remedies to "abstention, finality, and ripeness-that govern the timing of federal-court decisionmaking"); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51 n. 9, 58 S.Ct. 459, 82 L.Ed. 638 (1938) (describing exhaustion as a "rule of judicial administration"). . . . . [I]t is of no consequence that here, as is often the case, there are disputed facts that must be resolved in order to determine whether the claims were exhausted.  See Bryant, 530 F.3d at 1373–74 (holding the district court properly acted as fact finder in resolving conflicting evidence that raised a genuine issue of material fact about whether administrative remedies were available to the prisoner plaintiffs); accord Messa, 652 F.3d at 309; Dillon, 596 F.3d at 271.  Matters of judicial administration often require judges to decide factual disputes and the Seventh Amendment is not implicated as long as the facts are not bound up with the merits of the underlying dispute.

Small v. Camden Cnty., 728 F.3d 265, 269-70 (3d Cir. 2013)

Moreover, the exhaustion requirement of the PLRA is one of "proper

exhaustion."  Woodford v. Ngo, 548 U.S. 81, 84 (2006).  Failure to comply with the

procedural requirements of the available grievance system will result in a claim being deemed procedurally defaulted.  Id. at 90; Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004).  An inmate cannot circumvent the PLRA's exhaustion requirement by failing to properly exhaust the prison's administrative review process, or by waiting until such remedies are no longer available to him.  Woodford, 548 U.S. at 95. However, if an inmate shows that the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement. Brown v. Croak, 312 F.3d 109, 112-13. Likewise, "[w]here [the inmate] failed to receive even a response to the grievances addressing the . . . incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." Small v. Camden Cnty., 728 F.3d 265, 273 (3d Cir. 2013).

In this case, we are presented with an exhaustion defense, but that affirmative defense is presented to us on a factual record which is marked by confusion, conflicts and contradictions.  In particular, the record reflects that during the period relevant to this action, the Department of Corrections maintained distinct administrative processes for inmates to use to grieve issues relating to their conditions of confinement generally, which typically are pursued through the inmate grievance system, DC-ADM 804, and a separate policy relating to administrative custody

procedures under DC-ADM 802, which is available for inmates to challenge initial and administrative custody placement.  On or about June 7, 2011, the DC-ADM 802 was amended to be the exclusive policy or administrative remedy available to an inmate in administrative custody to pursue any issue relating tot he placement, duration, conditions, or other circumstances of their administrative custody.  (Def. SMF ¶ 32 and Appx. D, F, Declaration of Jaime Boyd, and DC-ADM 802 as amended.)  This includes any conditions of administrative custody confinement that would previously have fallen under DC-ADM 804.  (Id.)

Under DC-ADM 804, the Department of Corrections maintains a grievance system that offers a three-phase grievance and appeals procedure.  (DC-ADM 804; (Def. SMF, Ex. A, Declaration of Keri Moore.)  Pursuant to DC-ADM 804, inmates first file grievances with the Facility Grievance Coordinator at the facility where the events upon which the complaint is based occurred.  If the inmate is unsatisfied with the initial review of his grievance, he may appeal the decision to the Facility Manager (Superintendent).  Upon receiving a decision from the Superintendent, the inmate may file an appeal with the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within 15 days of the Superintendent's decision.  Id.

The DC-ADM 804 was implemented as a policy that articulated a formal procedure, a "forum for review," and an avenue of appeal.  The DC-ADM 804 was

instituted to ensure that inmates had an avenue to resolve specific problems, and that the administrative avenue consisted of an initial review and then two tiers of appellate review, imposing different levels of responsibilities on the inmates during each stage of the administrative process.   In order to exhaust administrative remedies in accordance with this three-step process, inmates must file grievances and appeals in the place, time, and manner that the DOC's administrative rules require.  (Id.; Appx. at B, C, DC-ADM 804.)

The defendants have submitted a declaration from Keri Moore, who serves as a records custodian for all grievance appeals submitted to SOIGA.  (Def. SMF, Appx. A.)  Ms. Moore has represented that she reviewed the grievance appeal records for Chris Washington-El between November 17, 2009, and July 22, 2011, when he was housed at SCI-Frackville.  The results of this search reveal that Washington-El filed six grievances during this time, and all six were appealed to final review.  Those six grievances are 311261, 317895, 340206, 343321, 345950, and 356348, (Def. SMF, Appx. A, Moore Decl., and Appx. G, Grievance Chart), which may be summarized as follows:

- • Grievance 311261 involved allegations concerning Washington-El bringing legal material within him during a transfer from SCI-Pittsburgh.

- Grievance 317895 involved allegations regarding the confiscation of Washington-El's legal mail and property.

- Grievance 340206 involved allegations concerning a transfer to another unit for filing a grievance about not being provided appropriate clothing while in the yard, and alleges retaliatory conduct by prison staff in response to this grievance.

- Grievance 343321 involved allegations regarding missing laundry, all of which apparently was returned or replaced, but which Washington-El may be claiming was retaliatory.

- Grievance 345950 involved allegations concerning medical care.

- Grievance 356348 involved allegations concerning the issuance of a misconduct in retaliation for complaining about lost laundry or other problems with laundry service, and relates to Washington-El's retaliation claim in this case against defendant Dando, a correctional officer.

(Moore Decl. ¶¶ 11-16 and Appx. H, Grievances.)

In addition to these six matters, Washington-El has also submitted multiple documents set forth on unnumbered grievance DC-ADM 804 grievance forms, as well as what appear to be appeals under DC-ADM 802, challenging his longstanding and ongoing placement in administrative custody and his continuation on the RRL, as well as the quality of his reviews by the PRC, as well as other matters relating to this condition of his confinement in administrative custody, and his ongoing

difficulties with certain correctional staff at SCI-Frackville.[1]  These documents seem to reflect an ongoing dialogue between Washington-El and the Superintendent at SCI-Frackville, Defendant Robert Collins. (Doc. 75.)  In these documents, Superintendent Collins indicates his intention to look at having Washington-El removed from the RRL by the end of June, 2011, which is an issue of great significance to Washington-El, and seems to be the overarching issue animating this litigation.  (Id.)

Importantly, these documents also include evidence that Washington-El was trying to determine the appropriate procedure to grieve his complaints, and eventually he was specifically advised to use the DC-ADM 802 form for all issues relating to his administrative custody.  Thus, on January 21, 2011, Washington-El wrote to P. Damiter, the grievance coordinator at SCI-Frackville, to clarify what forms he should be using to challenge a myriad of issues he claimed to be having with staff and his ongoing restrictive custody assessment and placement:

> In terms of my AC having an adverse affect on my mental health, it being an adverse act of retaliatory treatment, my religious exercise and religious activities on AC, equal treatment and conditions of confinement on AC – should they be addressed through the 802 procedures , PRC and AC Appeals or by grievance?  Thank you for your attention in this matter and I'll wait to hear back from you.

---

[1]  Washington-El has also represented that on some occasions, corrections staff refused to provide him with grievance forms, or otherwise impeded his ability to pursue administrative remedies.  (Doc. 69, at 4.)

(Doc. 76-1, Ex. 44, Inmate's Request to Staff Member.)  On January 26, 2011, P. Damiter replied: "All those issues are covered under the 802.  Your requests should be done at PRC and as previously been told your appeal rights are every 90 days by policy."  (Id.)  It thus seems that at various times during his incarceration at SCI-Frackville, Washington-El used both the DC-ADM 804 and the DC-ADM 802 procedures, that he sought guidance from the grievance coordinator in early 2011 about the proper means of raising his claims administratively, and that he was instructed to bring all of his claims arising out of his administrative custody – which would apparently include all of the claims brought in this case – pursuant to DC-ADM 802.  The defendants now seem to be suggesting that Washington-El erred by failing to exhaust various grievances pursuant to the procedures governing DC-ADM 804, but this documentary evidence suggests that Washington-El was being informed otherwise by prison officials, and that Washington-El followed the instructions he was given.

The parties' apparent confusion on this issue may reflect certain changes that were being made to DOC policies around this time, as in June 2011, DC-ADM 802 was amended to become the exclusive policy or administrative remedy an inmate in administrative custody has to pursue any issue concerning the placement, duration, conditions, or other circumstances of their administrative custody.  (Def. SMF ¶¶ 32-

33; Appx. at D, F, Boyd Decl.)  Prior to this change, condition of administrative custody confinement would apparently have fallen under DC-ADM 804.  (Id.)  Thus, although the defendants now assert that Washington-El filed certain grievances or appeals relating to his administrative custody pursuant to DC-ADM 802, they also claim that in his appeals he would refer to "other issues not appropriate for 802 at that time." (Def. SMF ¶¶ 38-39.)  The record thus presents uncertainty and inconsistency on the part of DOC officials and Washington-El, and although the defendants now endeavor to dismiss all of Washington-El's claims on the grounds that he failed to exhaust his claims, we do not find that they have carried their burden of proving that they are entitled to this relief on summary judgment.

The current record contains evidence supporting Washington-El's assertion that he was misled when he inquired about how he was to grieve issues relating to his confinement while in administrative custody.  If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement.  See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000).  At a minimum, these conflicting accounts of the grievance process at the prison raise factual questions which must be addressed before this legal question of exhaustion may be resolved.  In this setting, where there are unresolved factual disputes, we are cautioned to engage in an evidentiary proceeding to resolve

the application of this affirmative defense, see Small v. Camden Cnty., 728 F.3d 265, 273 (3d Cir. 2013), and summary judgment on this issue would be inappropriate at this juncture.

We are mindful, however, of the fact that this affirmative defense should be resolved by the Court as a matter of law, even if that resolution involves further development of the factual record and an evidentiary hearing.  Therefore, it is also recommended that the Court remand this matter to the undersigned for the scheduling of such a hearing, resolution of factual disputes, and preparation of a Report and Recommendation on this affirmative defense.  Thus, although the defendants may be able to obtain judgment in their favor on some of Washington-El's claims on exhaustion grounds, it is recommended that any decision regarding whether, and to what extent, Washington-El properly exhausted his claims should await further proceedings, including a plenary hearing where this issue may be more fully addressed.

###### C.   The Defendants Have Not Demonstrated that they Are Entitled to Summary Judgment on Plaintiff's Claim That His First Amendment Rights Were Violated

Washington-El claims that during his time in administrative custody at SCI-Frackville, his right to practice his religious beliefs was unconstitutionally restricted. Washington-El originally claimed to be Protestant, but subsequently converted to

Islam.  He claims to be Moorish American, which he has explained draws upon traditions from both Christianity and Islam, and uses both the Bible and the Quran. The plaintiff claims that his right to practice his religious beliefs was unreasonably burdened by the decision of prison officials to deprive him of his television, which he wanted to use to watch religious programming.  He also claims that he was denied access to religious counseling, was denied a copy of the Quran, and was denied the right to see an Imam, at least for part of the time he was at SCI-Frackville.

The defendants offer little in support of their claim that these deprivations did not implicate, or limit, Washington-El's exercise of his First Amendment rights. Instead, they observe that the plaintiff had a Bible, some undefined "other religious literature," and "for some of the time" had access to an Imam.  (Doc. 83, at 4.)  The defendants also note that the plaintiff alleged in his complaint that he had conferred with a Chaplain.  (Id.)  Aside from these observations and limited citation to case law, the defendants offer relatively little in response to the plaintiff's allegations, and offer little legal or evidentiary support for their contention that the Court should grant summary judgment in their favor.

In Turner v. Safley, the Supreme Court held that "a prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests."  482 U.S. 78, 89 (1987).  In determining whether

such a reasonable relation exists, the following four relevant factors should be considered:

> (1) [T]here must be a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest put forward to justify it (the 'First Turner Factor'); (2) whether the inmate has alternative means of exercising the right at issue; (3) the burden that the accommodation would impose on prison resources; and (4) whether any ready alternatives to the regulation exist that would fully accommodate the inmate's rights at de minimis cost to valid penological objectives.

Sharp v. Johnson, 669 F.3d 144, 156 (3d Cir. 2012).  Satisfaction of the first Turner factor is a threshold inquiry that must be undertaken before the other factors will be considered, and the burden of proving the first Turner factor is on prison officials. Id.  Although this burden rests with prison officials, it is nonetheless a "slight" burden of showing a valid, rational connection exists between the challenged policies and the prison's interests.  We also must remain mindful of the Supreme Court's admonition that where "other avenues remain available for the exercise of the asserted right, ... courts should be particularly conscious of the measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation."  Turner, 482 U.S. at 90.

Although the plaintiff's complaint does not contain an abundance of allegations regarding the restrictions that the defendants allegedly placed on his exercise of his

religious beliefs, the complaint does state that he repeatedly requested to have permission to view religious programming or videos that were supposed to be available to inmates, but was nevertheless denied. (Am. Compl. ¶137, 139, 140, 141.) Likewise, the plaintiff has alleged that for approximately seven months he requested to receive some religious counseling, a Quran and other Islamic literature, all of which was apparently denied because SCI-Frackville did not contract with or employ an Imam during this time. (Id. ¶¶ 145-46.) Moreover, the plaintiff claims that although he was denied access to religious counseling and literature for months, other inmates similarly situated to him were provided "religious counseling, religious books, and literature of their faith." (Id. ¶ 147.)

Regardless of the strength of the plaintiff's allegations, or whether he is able to prove them, the defendants' have offered little to refute the allegations or to demonstrate that the deprivations, if true, were justified in accordance with the first Turner factor. The defendants thus suggest that this claim should fail simply because the plaintiff was provided a Bible and some unspecified pieces of literature, or that for some period of time he was able to speak with either an Imam or a prison Chaplain. But these assertions, even if true, do not respond at all to Washington-El's claim that he was denied access to Islamic literature, or access to religious programming enjoyed by other similarly situated inmates. The defendants have

pointed to no evidence in the record that compels judgment in their favor, or that justifies any prison regulations that may have impacted Washington-El's religious exercise.

Thus, the defendants would have the Court infer, based on very little evidence, that any burden on the plaintiff's exercise of his religious beliefs was not substantial. (Doc. 83, at 4.)  However, it is the defendants who bear the "slight" burden of satisfying the first Turner factor, and they have not done so.  The defendants' brief and accompanying statement of facts focuses chiefly on demonstrating that the plaintiff did not exhaust his administrative remedies, but focuses far less on providing even a modicum of evidence either to refute the plaintiff's allegations, or to justify any incidental burden on the plaintiff's exercise of his religious beliefs while he was being held in administrative custody.  Although this burden is only "slight," it is nevertheless a burden that the defendants bear, and we believe at this juncture that the defendants have not demonstrated that they are entitled to summary judgment on this claim based upon limited argument and little citation to actual evidence to justify the alleged deprivations.[2]  Although the defendants may ultimately be able to justify any

---

[2]  The absence of citation to the record, or a record-based explanation regarding the alleged restrictions on Washington-El's religious exercise makes the court's job to evaluate the Turner factors nearly impossible.  The Third Circuit has explained that "the party defending the policy should 'demonstrate' that the policy's drafters 'could rationally have seen a connection' between the policy and

restrictions that were imposed on Washington-El as an inmate held in administrative

custody, they have not done so in their summary judgment papers, and summary

judgment on this claims should, therefore, be denied at this time.[3]

### D.   The Defendants Have Not Addressed Washington-El's Eighth Amendment Claims, and Thus Summary Judgment on these Claims is Unwarranted at this Time

Washington-El has also purported to bring a claim that the conditions of his

confinement violated the Eighth Amendment's prohibition against cruel and unusual

punishment.  (Am. Compl., Count Three.)  In particular, the plaintiff claims that he

was repeatedly subjected to 90-day sanctions in administrative custody, with little

regard for his serious mental health needs of which the defendants were aware, and

that the defendants exhibited deliberate indifference to Washington-El's mental

---

the interests, and that this burden, though slight, must 'amount [] to more than a conclusory assertion.'"  Wolf v. Ashcroft, 297 F.3d 305, 308 (3d Cir. 2002).  Thus, "[p]art of the court's inquiry under Turner is whether the government has satisfied this requirement."  Id.  Because the defendants have done so little to address Washington-El's First Amendment claims, or to justify any restrictions that prison policies or other circumstances may have placed upon Washington-El's exercise of his religious beliefs, it is submitted that the Court lacks a sufficient basis to find in the defendants' favor on the first Turner factor, and that summary judgment is thus inappropriate.

[3] If the defendants believe that there is evidence in the record that would support their motion for summary judgment with respect to the plaintiff's First Amendment claims, they should identify such evidence in a more narrowly focused and thoroughly documented summary judgment motion.

health during his incarceration at SCI-Frackville.  In their briefs, the defendants have not addressed the merits of Washington-El's Eighth Amendment claims, but appear instead to have relied on their initial argument that these claims should be dismissed because Washington-El did not exhaust them.  However, because we do not find that the defendants have demonstrated that they are entitled to judgment in their favor on the basis of Washington-El's asserted failure to exhaust his administrative remedies, we find that there is no basis upon which for the Court to enter judgment on this claim on the current record.[4]

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, and requires that prison officials do not house inmates under conditions that deprive them of basic human needs, "such as the basic human need for reasonable safety, adequate physical space, and the need for some degree of

---

[4] To the extent the defendants believe that they are entitled to summary judgment on this claim, it is recommended that they also address the merits of Washington-El's Eighth Amendment claim in a more fully documented summary judgment motion, and present argument and citation to the record if they believe that they are entitled to judgment on this particular claim.  In addition, if this matter is referred to the undersigned for purposes of conducting a plenary hearing into the issue of whether Washington-El exhausted his administrative remedies with respect to this claim – which is not entirely clear – the defendants would be permitted to renew and substantiate their assertion that these claims were unexhausted.  However, we simply do not find that on the current incomplete factual record, and the current briefing, that summary judgment on the Eighth Amendment claims is appropriate.

ventilation and fresh air." <u>Mitchell v. Dodrill</u>, 696 F. Supp. 2d 454, 466 (M.D. Pa. 2010) (citing <u>Helling v. McKinney</u>, 509 U.S. 25, 32 (1993)).  The Eighth Amendment does not, however, mandate that prisons be entirely free from discomfort.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994).  Instead, to establish a claim for a violation of the Eighth Amendment, a plaintiff must show that he has been deprived of "the minimal civilized measures of life's necessities."  <u>Griffin v. Vaughn</u>, 112 F.3d 703, 709 (3d Cir. 1997).  In order to do so, a plaintiff must demonstrate that the conditions of his confinement post a "substantial risk of serious harm" to his health or safety.  <u>Farmer</u>, 511 U.S. at 834.

Washington-El faces an exacting burden in advancing this Eighth Amendment claim against prison officials in their individual capacities.  To sustain such a claim, he must:

> [M]eet two requirements:   (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted).  In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u>  "Deliberate indifference" is a subjective standard under <u>Farmer</u>-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

<u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 125 (3d Cir. 2001).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical or mental-health care.  In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  To establish a violation of his constitutional right to adequate medical care in a prison setting, Davis is required to point to evidence that demonstrates both (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 104.  Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or by "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Notwithstanding the foregoing, well-established legal framework that governs Eighth Amendment claims in the prison context, the parties have not addressed

Washington-El's claims on their merits, or addressed whether Washington-El's claims find support in the record.  We believe, therefore, that it would be premature and inappropriate for the Court to engage in this analysis on its own, without any substantive and evidentiary input from the defendants in the first instance to support their motion for summary judgment.  Instead, if the defendants believe that they are entitled to summary judgment on the merits of Washington-El's Eighth Amendment claims, they should explain why, and provide supporting citation to case law and the record, in a more focused and fully supported summary judgment motion.

### E.   The Defendants are Not Entitled to Summary Judgment on Washington-El's First Amendment Retaliation Claims

Washington-El also argues that the defendants subjected him to a spate of retaliation based upon his exercise of protected First Amendment activity, such as filing grievances and lawsuits.  Thus, he claims that his continued confinement in administrative custody was retaliatory; he claims that Superintendent Collins approved the PRC's recommendations regarding Washington-El's placement out of retaliatory motive; and he claims that other defendants denied him due process, or denied him religious materials, or denied him access to legal materials, or denied him appropriate clothing, all for retaliatory reasons.   Although we believe that Washington-El's showing in support of these claims has been somewhat limited, we

also find that the defendants have responded in a scattershot manner that does not clearly demonstrate that they are entitled to summary judgment on all of Washington-El's claims, many of which are fact-bound and incapable of resolution on the briefs.

In order to state a claim for First Amendment retaliation, Washington-El bears the burden of proving that he engaged in constitutionally protected conduct. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Next he must show that he suffered some adverse action at the hands of prison officials. Id.; see also Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). This step is satisfied if the prisoner-plaintiff demonstrates that the action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Id. The plaintiff must then demonstrate that there is a causal link between the exercise of his constitutional rights and the adverse action taken against him. Id. If a prisoner-plaintiff satisfies these steps, prison officials may still prevail if they can prove that they would have taken the same action or made the same allegedly retaliatory decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. Rauser, 241 F.3d at 334.

The defendants argue that Washington-El has failed to satisfy his initial burden because he has not clearly indicated which defendant subjected him to a particular allegedly retaliatory action, such as a transfer to another unit, and they claim that with

29

little explanation that Washington-El has failed to demonstrate a causal connection between his exercise of protected activity and allegedly retaliatory conduct.  The defendants also claim that one instance of allegedly retaliatory conduct – the issuance of a misconduct for failing to obey an order – cannot constitute adverse action because Washington-El was found guilty of the misconduct.  See <u>Nifas v. Beard</u>, 374 F. App'x 241 (3d Cir. 2010) (finding that a retaliation claim fails where there was "some evidence" to supprt guilty findings for three disciplinary charges brought against the plaintiff); <u>see also</u> <u>Henderson v. Baird</u>, 29 F.3d 464, 469 (8th Cir. 1994) (stating that a finding of "some evidence" to support a prison disciplinary determination "checkmates" the prisoner's retaliation claim).  Although it is true that Washington-El was initially found guilty of that particular misconduct, he was later cleared of it following an appeal.  The defendants suggest that this is irrelevant, but they provide no compelling citation for the proposition that a misconduct that is later set aside nevertheless operates to absolutely foreclose a plaintiff's retaliation claim, and we have found none.

It is somewhat difficult to unpack Washington-El's retaliation claims because he sometimes seems to be contending that virtually all aspects of his incarceration at SCI-Frackville amounted to retaliation, including his prolonged placement on the RRL, and the fact that he remained in administrative custody throughout his

confinement.  Nevertheless, liberally construed, specific instances of retaliation can be gleaned from the amended complaint.  Washington-El alleges that he was deprived of proper clothing, transferred off of his unit, and deprived of personal property in retaliation for filing grievances – something that he claims the defendants were all aware of, and certain defendants told him that they were withholding clothing and personal articles from him for retaliatory reasons.  (Am. Compl. ¶¶ 38-43.)  Likewise, the plaintiff has claimed that he was maintained on the RRL because of filing grievances, and that he was specifically informed that his RRL status was due in part to his grievance activity.  (Id. ¶¶ 119-121.)  He also claims that defendant Dando issued him a misconduct out of retaliation for certain other protected grievance activity, that he was sanctioned as a result of this misconduct, which was later set aside by the PRC because the claimed misconduct was actually not a violation.  (Id. ¶¶ 93-110.)

The defendants parry with Washington-El regarding these allegations, and they parse the claims in asserting that the evidence does not fully support  those claims, but they do not highlight evidence in the record that actually compels judgment in their favor.  Likewise, the defendants invite the Court make fact-based judgments about whether certain defendants rather than others were involved in the allegedly

retaliatory conduct, but they do not direct the Court to evidence in the record that warrants such decisionmaking by the Court.

Elsewhere, the defendants urge the Court to find as a matter of law that Washington-El has failed to prove causation simply because one particular instance of retaliation occurred some months after Washington-El had engaged in protected conduct.  Although temporal proximity may be relevant in assessing causation in a retaliation claim, <u>Rauser</u>, 241 F.3d at 334, it is not necessary in order to prove retaliatory animus, <u>see</u> <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279 (3d Cir. 2000).  Thus, the defendants do not clearly explain how the passage of some period of time between alleged instances of retaliation compels the entry of summary judgment in their favor, particularly since Washington-El is claiming a concerted pattern of activity marked by repeated instances of retaliatory conduct.

In summary, we find that the defendants have failed to carry their burden of demonstrating that they are entitled to summary judgment on Washington-El's retaliation claims, and that the resolution of these claims will depend upon the resolution of disputed issues of facts in the record, something that must await more fully documented summary judgment motion.

**F.      The Plaintiff's RLUIPA Claims are Moot and the Relief He Seeks for Alleged Violations of this Statute is Not Available**

In addition to bringing a claim that the defendants violated his First Amendment rights to practice his religious beliefs, Washington-El also alleges that the same restrictions violated the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). The defendants are entitled to summary judgment on this claims, which either seeks relief that is not available or has been rendered moot by Washington-El's transfer to another prison.

RLUIPA targets two areas of state and local action: land-use regulation, RLUIPA § 2, 42 U.S.C. § 2000cc, and restrictions on the religious exercise of institutionalized persons, RLUIPA, § 3 2000cc-1. Sossamon v. Texas, – U.S. –, 131 S. Ct. 1651, 1656 (2011). Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of an institutionalized person unless the government demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. RLUIPA also includes a private cause of action to plaintiffs: "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."

Notwithstanding this statutory language, however, in <u>Sossamon</u> the Supreme Court held that states remained immune from private suits for money damages, and that by accepting federal funding, states did not consent to waive their sovereign immunity to private suits for money damages. Accordingly, to the extent Washington-El's complaint can be read to demand money damages from the Department of Corrections for alleged violations of RLUIPA such claim is clearly foreclosed by <u>Sossamon</u>. Likewise, the Third Circuit has held that the RLUIPA provides no right to money damages against individual defendants, even when those individuals are state officials. See <u>Sharp v. Johnson</u>, 669 F.3d 144, 154 (3d Cir. 2012). Thus, any claim asserted against the individual defendants for money damages based upon alleged violations of RLUIPA also fail as a matter of law.

If Washington-El's complaint can be construed to seek injunctive relief based upon alleged RLUIPA violations during his custody at SCI-Frackville, his subsequent transfer to SCI-Huntingdon during the summer of 2011 rendered such claims moot. "[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." <u>Preiser v. Newkirk</u>, 422 U.S. 395, 401 (1975); <u>see also</u> <u>Abdul-Akbar v. Watson</u>, 4 F.3d 195, 206 (3d Cir. 1993). Furthermore, "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims." <u>Sutton v. Rasheed</u>, 323

34

F.3d 236, 248 (3d Cir. 2003).  After being transferred in 2011, the plaintiff has been housed at SCI-Huntingdon during the pendency of this litigation, and there does not appear in the record any reason to expect that he will be returned to SCI-Frackville any time in the near future.  Accordingly, to the extent that Washington-El seeks injunctive relief concerning the conditions of his confinement at SCI-Frackville, or the burdens placed upon the exercise of his religious beliefs that he allegedly encountered at SCI-Frackville, those claims have now been rendered moot by his transfer to SCI-Huntingdon.

### G.    Washington-El's Due Process Claim Regarding his Ongoing Segregation in Administrative Custody and on the RRL Fail

One of the animating themes that runs throughout Washington-El's amended complaint, and his various filings in this litigation, relates to his frustration with his extended confinement in administrative custody and his lengthy placement on the RRL.  Washington-El argues not only that his continued placement in administrative custody and the RRL may have been retaliatory, but that it also violated his right to due process.

According to DOC policy DC-ADM 802, Administrative Custody is defined as "a status of confinement for non-disciplinary reasons that provides closer supervision, control, and protection than is provided in general population."

35

DC-ADM 802, Section 3(A)(1).  An inmate confined on AC status does not have the privileges available in general population security level housing, and instead, receives a more limited set of privileges afforded within the Restricted Housing Unit.  Id. Under DOC regulations, an inmate may be transferred from general population to administrative custody by order of the shift commander for the following reasons:

a. the inmate is in danger by/from some person(s) in the facility and cannot be protected by alternate measures;

b. placement in general population would endanger the inmate's safety or welfare when it is not possible to protect him/her by other means;

c. the inmate is a danger to himself/herself or others;

d. the inmate is suspected of being or is the instigator of a disturbance;

e. the inmate would pose an escape risk in a less secure status;

f. the inmate has been charged with, or is under investigation for a violation of facility rules and there is a need for increased control pending disposition of charges or completion of the investigation;

g. the inmate has requested and been granted self-confinement;

h. the inmate is being held temporarily for another authority and is not classified for the general population of the holding facility; however, a Parole Violator (PV) and temporary transfers from another facility are eligible for release to general population;

i. the inmate has a detainer for a pending capital case, for which the prosecution is seeking the death penalty;

j. no records and/or essential information are available to determine the inmate's custody level or housing needs; and/or

k. the inmate has completed a Discipline Custody (DC) sanction but one or more of the above reasons exist, (or the facility has an operational need (e.g., appropriate bed space) to temporarily assign the inmate to AC status).

DC-ADM 802, Section 1(A)(1).

Moreover, a Facility Manager or his or her designee may request that the Secretary place an inmate on Administrative Custody status on the Restricted Release List when the inmate "poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern." Id. at Section 1(B).[5]  Inmates on the Restricted Release List are a subset of the

---

[5] Specifically, criteria for placing an inmate on the RRL include, but are not limited to, the following:

a. assaultive history against staff;

b. assaultive history against inmate(s);

c. sexual assault history;

d. escape history, or serious escape attempt;

inmates who have been placed in the RHU on Administrative Custody status.  An RRL designation merely changes the final decision-maker with the authority to release the inmate from AC status into the prison's general population.  Id. Specifically, when an inmate is placed on the Restricted Release List, the designation takes the authority to release the inmate from AC status from the Program Review Committee ("PRC") and transfers it to the Secretary or his or her designee.  Id.

Furthermore, both RRL and non-RRL inmates are to have their custody status periodically reviewed by the PRC.  In the case of a non-RRL inmate, either the PRC or the Superintendent has the final authority to release the inmate into general population.  See DC-ADM 802, Section 4(A).  In the case of a RRL inmate, however, the PRC may recommend the inmate's release from AC status into general population, but the release requires the approval of the Secretary of Corrections or his

---

e. threat to the orderly operation of a facility (i.e., attempting to organize inmates, demonstrated involvement in a Security Threat Group (STG) that poses a risk to the security of the facility, etc.);

f. Special Management Unit (SMU) graduate who remains a threat; and/or

g. SMU failure.

DC-ADM 802, Section 1(B)(2).

or her designee.  See id.  In all other respects, RRL inmates are treated identically to their non-RRL counterparts on AC status.  See id.

In this case, Washington-El was placed into administrative custody on the RRL prior to his transfer to SCI-Frackville, and evidence in the record indicates that this placement related to an investigation that the DOC undertook into an alleged escape incident at SCI-Graterford in which Washington-El was suspected of being involved. These records also reveal that Washington-El was deemed to be a security threat and to pose a risk of escape.  (Def. SMF, Exs. N, O, P.)  The records also reflect that Washington-El persistently challenged his ongoing confinement in administrative custody, and his continued placement on the RRL, throughout the time he was at SCI-Frackville.  The record shows that the PRC provided regular reviews of Washington-El's custody status, and provided reasons for his continuation in restrictive custody. Washington-El also received regular responses from prison officials to whom he complained  about his placement, and these records indicate that prison officials, including the Superintendent at SCI-Frackville were hoping that Washington-El would take the steps necessary to secure his removal from the RRL and eventually rejoin general population.  (Id.)

Nevertheless, Washington-El contends that his prolonged confinement in administrative custody and on the RRL violates his right to procedural due process,

or otherwise suggests that his placement and continuation in this restricted custodial setting implicates due process.

Protected liberty interests arise either from the Due Process Clause or from a state-created statutory entitlement.  See Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Bd. of Regents v. Roth, 408 U.S. 564, 575 (1972)).  In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court explained that in determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees, such state-created liberty interests could arise only when a prison's action imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  515 U.S. at 483.  At issue in Sandin was whether an inmate had a protected liberty interest in remaining free of disciplinary custody or segregation.  Considering that case, the Court held that inmate did not have any such protected interest because even though the segregation was punitive, it "did not exceed similar, but totally discretionary confinement in either duration or degree of restriction."  Id. at 486.  In reaching this conclusion, the Court considered two factors:  (1) the amount of time the prisoner was placed into disciplinary segregation; and (2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.  Id.

In this case, the record taken in the light most favorable to Washington-El supports his contention that his long-term confinement in administrative custody has imposed a significant hardship on him in relation to the ordinary incidents of prison life. The record indicates that during the period at issue in this case, Washington-El had been held in restrictive custody, with limited privileges, and limited interaction with others, for several years. The evidence shows that inmates held in restrictive housing are confined to their cells for 23 hours per day, five days a week, and 24 hours per day for two days a week. Washington-El apparently had little access to educational or vocational programming, and limited opportunity to interact with others aside from correctional officers and DOC officials. In a case of similar long-term confinement in segregated administrative custody, the Third Circuit Court of Appeals had "no difficulty" in concluding that such confinement, with no prospect of immediate release in the near future, was "atypical" and that the inmate's eight-year confinement "subjected him to conditions that differ[ed] significantly from 'routine' prison conditions in Pennsylvania state institutions." Shoats, 213 F.3d at 144. The record taken in the light most favorable to Washington-El similarly supports his claim that his long-term confinement in administrative custody, and prolonged segregation on the RRL, has been "atypical" in relation to the ordinary

incidents of prison life, and that he has been subjected to conditions that diverge substantially from routine prison conditions in Pennsylvania.

However, this finding does not also compel the conclusion that Washington-El has been deprived of procedural due process. In <u>Shoats</u>, the Third Circuit held that the process outlined above with respect to DC-ADM 802 and the procedures for reviewing inmates' administrative custody satisfied the "minimum constitutional standards for due process," and foreclosed an inmate's claim that his long-term confinement in administrative custody was unconstitutional. <u>Shoats</u>, 213 F.3d at 146-47. The defendants in this case have submitted substantial documentation to show that Washington-El's custody was reviewed monthly by the PRC and the Superintendent at SCI-Frackville, and that he had numerous opportunities to present his views to the PRC and to the Superintendent, which he did regularly, and that he exercised his rights to appeal. (Def. SMF, Exs. N, O, P.) These records indicate that Washington-El was making progress in a restrictive custodial setting, and these records frequently reflect optimism about his progression out of administrative custody, while also underscoring a continuing concern that arose out of a past incident at SCI-Graterford. Washington-El complains that his reviews were perfunctory, or that they reflect bias, and that some of his reviews by PRC staff were conducted at his cell door, something he refers to casually and dismissively as a

"walkby". However, the documents in the record undermine his bald assertions or characterizations, and he provides no support for his claim that the PRC's review was constitutionally infirm simply because the committee would, at times, meet with Washington-El at his cell door.

Thus, although we do agree with Washington-El that the record supports his claim that he has been subjected to an "atypical" hardship as a result of his long-term administrative custody and placement on the RRL, we also find that the same record demonstrates that his continued placement "is supported by evidence sufficient to pass constitutional muster." Id. at 147. Washington-El received the periodic reviews conducted by the PRC in accordance with DOC policy, and those policies have been found to comport with the minimum constitutional standards for due process. Accordingly, Washington-El's due process claim fails as a matter of law and the defendants are entitled to summary judgment on this claim.

## III.   **Recommendation**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that the defendants' motion for summary judgment (Doc. 54.) be granted in part and denied in part as follows:

1.   The defendants are entitled to summary judgment on the plaintiff's Due Process claim set forth in Count Two of the Amended Complaint.

2.     The defendants are entitled to summary judgment on the plaintiff's RLUIPA claim set forth in Count Four of the Amended Complaint.

In all other respects, the motion should be denied at this time.

IT IS FURTHER RECOMMENDED THAT the Court remand this matter to the undersigned for purposes of conducting a plenary hearing, and preparing a report and recommendation, on the question of whether Washington-El exhausted any of his remaining claims.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

44

Submitted this 1st day of December, 2014.

_**S/Martin C.  Carlson**_
Martin C. Carlson
United States Magistrate Judge